THE MECHANICS NATIONAL BANK OF WORCESTER *vs.*
THOMAS F. KILLEEN & another.[1]

Worcester. October 5, 1978. — January 17, 1979.

Present: HENNESSEY, C.J., QUIRICO, KAPLAN, WILKINS, & ABRAMS, JJ.

*Contract*, Loan. *Debt*, Default. *Consumer Protection Act*, Foreclosure on securities. *Truth-in-Lending Act. Damages*, Foreclosure on securities. *Interest.*

Under promissory notes whereby the borrower pledged certain shares of stock as security and agreed to deliver additional security or make payments on account to the bank's satisfaction, if the bank should deem the security already given to be insufficient, and which further provided that the borrower's obligations would, at the option of the bank, become immediately due and payable if the bank considered itself insecure, the borrower's obligations were not accelerated automatically when the bank deemed itself insecure and the bank did not have the right to foreclose on the stock without affording the borrower notice that the notes were due and a reasonable opportunity to satisfy his obligations. [106-108]

_____

[1] Shirley M. Killeen.

A bank's sale of stock pledged as security for certain loans, in the erroneous belief it had the right to sell it, did not constitute an unfair act within the meaning of G. L. c. 93A, § 2(a). [108-110]

A judge in an action under G. L. c. 93A did not err in finding that a bank did not use unfair, deceptive, or fraudulent acts or practices in obtaining a mortgage as additional security for promissory notes. [111]

A borrower was not entitled to relief under G. L. c. 140C by the fact that one of the two statutory forms of notice required by § 8(b) as to a mortgage on a borrower's principal residence did not have the bank's name on it where the omission was insignificant and unintended and where the borrower knew who the lender was and did not undertake seasonably to rescind the transaction. [111-112]

Where three outstanding promissory notes had different rates of interest, each based on the small business prime rate at the time of its execution, language in a mortgage, given as additional security for the notes, referring to the interest rates of the loans in terms of "the small business prime rate in effect from time to time" did not violate G. L. c. 140C. [112]

Where a bank wrongfully foreclosed on shares of stock pledged as security on promissory notes and placed an order for their sale, the borrower was entitled to recover the fair market value of the stock as reflected by the highest price for which shares of that stock sold on the stock exchange on that day. [113-115]

Where a bank wrongfully foreclosed on shares of stock pledged as security on promissory notes and placed an order for their sale, the borrower was entitled to have his obligations to the bank as of the day the stock was sold reduced by the fair market value of the stock on that date. [115-116]

CIVIL ACTION commenced in the Superior Court on July 26, 1974.

The case was heard by *Beaudreau, J.*

The Supreme Judicial Court granted a request for direct appellate review.

*James F. Queenan, Jr.*, for the plaintiff.

*Michael B. Keating (Peter M. Rosenblum & Theodore P. Seto* with him) for the defendants.

WILKINS, J. The principal issues in this case are (a) whether The Mechanics National Bank of Worcester (bank) violated its contractual obligations to Thomas F. Killeen (Killeen) when, on June 25, 1974, it foreclosed on 28,500 shares of stock (stock) in Certain-Teed Products

Corporation (company) pledged by Killeen as security for certain loans from the bank, and (b) if the bank wrongfully foreclosed on the stock, what the proper measure of damages is. We conclude that the bank wrongfully foreclosed on the stock and that Killeen is entitled to damages measured by the highest price at which shares of stock in the company sold on the New York Stock Exchange on June 25, 1974.

We must also decide the validity of a mortgage on the Killeens' home, given to the bank as additional security by Killeen and his wife (Killeens) on June 19, 1974. The Killeens argue that the bank violated G. L. c. 93A and G. L. c. 140C in the course of obtaining that mortgage. We agree with the judge below that the Killeens are not entitled to relief under either G. L. c. 93A or G. L. c. 140C.

## The Facts

The basic facts found by the judge are as follows. On June 25, 1974, Killeen, who had borrowed funds from the bank over the previous fifteen years, was indebted to the bank on three notes, each of which was a renewal of an earlier note. The first note, in the principal amount of $10,630.29 and bearing interest at the rate of 9.5% a year, was given on February 19, 1974, and due on August 19, 1974. The second note, in the principal amount of $176,-770.92, with interest at the rate of 10.5% a year, was given on April 30, 1974, and due on July 30, 1974. The third note, given on June 5, 1974, was in the principal amount of $152,974.82, bore interest at the rate of 11.5% a year, and was due on December 5, 1974. The total obligation on these three notes at their respective maturities was approximately $355,000. Each of these notes was secured by the stock and by other shares of stock, having a relatively low value, in another company.[2] All three of

---

[2] The first note was stated to be secured by slightly more than 28,500 shares of stock in the company, but no point of that difference has been made in this case. Certain life insurance policies were also pledged as

the notes were executed on identical forms, which had been printed for the bank. The borrower agreed to deliver additional security or make payments on account to the bank's satisfaction, if the bank should deem the security already given to be insufficient because of a decline in its market value. Each note further provided that Killeen's obligations under it "shall, at the option of [the] Bank, become immediately due and payable upon ... [IV] [the] Bank deeming itself insecure."

Shares of stock in the company had been selling on the New York Stock Exchange at more than $15 a share at the end of April, 1974, and the collateral pledged by Killeen was then worth more than $500,000. In the early part of June, 1974, however, the market price of the company's stock had fallen to just over $11 a share and the value of the collateral was less than $390,000. During the middle of June, the company's stock was selling at approximately $9 a share.

A day or two before the execution of the renewal note of June 5, 1974, Killeen had a conversation with a Mr. Kettell (Kettell), a vice president of the bank, who was in charge of the bank's loans to Killeen. He told Killeen that the bank was concerned by the declining market value of the stock. The bank, however, did renew an earlier loan on June 5, 1974. (third note).

Kettell had a further conversation with Killeen on June 10, 1974, at which time the value of all the security pledged to the bank was less than the obligations at maturity of the three notes. Kettell stated that the bank was feeling insecure with respect to the pledged collateral. He demanded additional security and said the bank would need a mortgage on the Killeens' home. Killeen pleaded for a ten-day delay, which was granted. There was no discussion of the sale of the pledged collateral.

security. Those policies were sold by the bank at a later time. Killeen has not complained of that sale.

On June 14, 1974, Kettell telephoned Killeen and pressed him for a mortgage on the Killeens' home. Kettell gave Killeen no assurance that the collateral would not be sold but rather indicated that a sale was a possibility. The Killeens executed a mortgage on their home on June 19, 1974. The property was unencumbered and had a value of at least $60,000. Two copies of a notice required under the Truth-in-Lending Act, G. L. c. 140C, were given to the Killeens. The Killeens' right to rescind the mortgage on their home, according to the Truth-in-Lending Act (see G. L. c. 140C, § 8), expired at midnight on June 24, a Monday.

On June 24, 1974, the bank's loan committee decided to sell the stock. The judge found that the bank "was feeling insecure." On June 25, 1974, Kettell advised the Killeens that the bank was selling all the stock. On June 24 and 25, the stock was selling at a slightly higher price than on June 19, the day the mortgage was given. Kettell did not tell Killeen that the bank had accelerated the due dates of the notes. He did not tell Killeen that the notes had become due and payable. He did not demand payment of the notes. During the afternoon of June 25, 1974, the bank placed an order with a broker to sell the 28,500 pledged shares. These securities were sold, as the judge ruled, in a commercially reasonable manner, in various blocks during June 25, 26, 27, and 28, yielding net proceeds of approximately $238,000. The highest price at which the company's stock sold on June 25, 1974, was $10 a share, and the lowest was $9 ⅜ a share. The highest price per share paid for any share sold for the bank was 9 ⅝, obtained on the first sale of 100 shares in the afternoon of June 25. The bank applied the proceeds first toward the satisfaction of all obligations then alleged to be due under the third note, the one with the highest interest rate, and then toward the principal obligation under the second note.

*Proceedings Below*

The dispute between the bank and the Killeens came to litigation in the following fashion. On July 17, 1974, the Killeens wrote the bank purporting to cancel the mortgage. On July 22, 1974, counsel for the Killeens sent the bank a demand letter under G. L. c. 93A, demanding rescission of the mortgage and damages for the wrongful sale of the stock. Four days later, the bank filed a complaint for declaratory relief in the Superior Court, seeking a determination that the Killeens had no right on July 17, 1974, to rescind the mortgage and that the mortgage remained in full force and effect. The Killeens counterclaimed, alleging violations of G. L. c. 93A and G. L. c. 140C, and seeking damages for the wrongful sale of the stock, rescission of the mortgage, and other relief. The bank then counterclaimed for the balance due on the first and second notes.

The judge ruled that the bank violated its contract with the Killeens by selling the stock as it did. He assessed damages based on the fair market value of the stock determined by the price per share (9⅝) at which the first block of shares was sold on June 25, 1974. He ordered the entry of judgment for the bank based on the balance of Killeen's obligations to the bank reduced by (a) the value of the shares of stock on June 25, 1974, as determined by him,[3] and (b) the proceeds of the sale of the pledged life insurance policies. The judge ruled that the mortgage was valid and enforceable as to any debt owed to the bank by Killeen. He ruled that there was no violation of G. L. c. 93A or G. L. c. 140C. The Killeens and the bank have appealed from a judgment which was entered in accordance with the judge's ruling.

---

[3] The judge expressed this result in different terms. He credited Killeen with (a) the proceeds of the sale of the stock received by the bank and (b) the difference between the value of the stock on June 25, 1974, and the proceeds of the sale of the stock—that is, the damages for the breach.

### The Bank's Right of Foreclosure

Killeen argues that the bank exceeded its rights in foreclosing on the stock on June 25, 1974. He challenges the judge's implied finding that the bank in good faith deemed itself insecure. He argues further that the maturity dates of the notes were not accelerated, and that, in any event, he was not in default on any obligation because he had no reasonable opportunity to make any payment to the bank. The judge ruled that Killeen was not in default on the notes when the bank foreclosed on the stock. We agree with that conclusion.

By the terms of the notes, Killeen's obligations were not accelerated automatically when the bank deemed itself insecure. See *Grozier* v. *Post Publishing Co.*, 342 Mass. 97, 105-107 (1961). The bank had to perform some positive act if it wished to accelerate those obligations. See *Wilshire Enterprises, Inc.* v. *Taunton Pearl Works, Inc.*, 356 Mass. 675, 678 (1970). The bank asserts that it satisfied this requirement by telling Killeen that it was going to sell the stock and by foreclosing on it. In the view we take of this case, we need not decide whether the bank properly accelerated the maturity dates of the notes. Nor do we have to determine whether acceleration of the due dates of the notes could be effective only on notice to Killeen or whether the statement that the stock was to be sold was somehow adequate notice of acceleration.[4]

Even if we assume that the bank in good faith deemed itself insecure and that it accelerated the maturity dates of the notes, the bank had the right to foreclose on the stock only in the event of a default by Killeen. See G. L. c. 106, §§ 9-501, 9-504(1). The essential question is whether, on June 25, 1974, when the bank foreclosed on the

---

[4] As to a debtor already in default, notice of acceleration is not necessary to advance the due date of an obligation; the commencement of suit itself makes an acceleration provision operative. *Quaranto* v. *Silverman*, 345 Mass. 423, 427 n.1 (1963). *Cassiani* v. *Bellino*, 338 Mass. 765, 768-769 (1959).

stock, Killeen was in default on his obligations to the bank. Cases relied on by the bank concerning the right of a creditor to proceed against collateral without notice or demand after there has been a default have no bearing until it is established that there was a default.

The rights of the parties are determined by the contractual agreement between them. See *Cassiani* v. *Bellino*, 338 Mass. 765, 768 (1959). The notes, which could have been controlling in this respect, did not explicitly define a default. See 2 G. Gilmore, Security Interests in Personal Property § 43.3, at 1193, 1195 (1965). The terms of the notes did not provide that accelerating the maturity dates of Killeen's obligations was a default.[5] It is clear, however, from the terms of the notes, that a failure to pay an obligation when due is a default. See 2 G. Gilmore, *supra* at 1193. Assuming that the notes were accelerated on June 25, 1974, and therefore then due, the bank had no right immediately to foreclose on the stock.

Certainly, Killeen could not read the bank's corporate mind and know that the notes were due. He was entitled to some notice that they were due, and not simply a statement that the stock was to be sold. After such notice, Killeen was entitled further to a reasonable opportunity to satisfy his obligations. That opportunity extended at least through the bank's business day on June 25, 1974, and perhaps beyond.[6] Because no such opportunity was

---

[5] The notes in this case permitted the bank to make the obligations due when it deemed itself insecure. They did not state that a default existed when the bank deemed itself insecure, or that in such a situation the bank had a right directly to foreclose on the stock. Cases where the agreement contained such provisions are of no assistance to the bank in this case. See, e.g., *Universal C.I.T. Credit Corp.* v. *Shepler*, 164 Ind. App. 516, 520 (1975); *Farmers Coop. Elevator, Inc.*, v. *State Bank*, 236 N.W.2d 674, 677 (Iowa 1975). The agreement involved in *Klingbiel* v. *Commercial Credit Corp.*, 439 F.2d 1303, 1307 (10th Cir. 1971), is more like the one involved in this case because it made insecurity significant only on the question of the right to accelerate and not on the question of the existence of a default.

[6] A cause of action in the case of a time instrument accrues on the

extended to Killeen and thus there was no default, the bank exceeded its contractual rights in foreclosing on the stock when it did.[7]

We stress again that, in the absence of statutory restrictions, the rights of the parties to secured transactions are controlled by the agreement between them. Under a different form of note, the course followed by the bank would have been permissible, subject to any statutory provisions governing that relationship.

Before determining what damages, if any, Killeen is entitled to for the bank's breach of contract, we consider the Killeens' claim that they have certain statutory rights in the circumstances.

### *Relief under G. L. c. 93A and G. L. c. 140C*

The Killeens are not entitled to relief under either G. L. c. 93A or G. L. c. 140C. The judge was correct in finding and ruling that the bank did not engage in an

---

day after maturity. G. L. c. 106, § 3-122(1)(*a*). The notes here were "payable at a definite time." G. L. c. 106, § 3-109(1)(*c*). The implication of these provisions is that there is no default under a time instrument until the end of the day during which the obligation under the instrument matures, and that at least until that moment there is no right to foreclose. See *Bethlehem Acceptance Corp.* v. *Ed Newman Motor Co.*, 230 Pa. Super. Ct. 441, 443 (1974); F. M. Hart & W. F. Willier, Commercial Paper under the Uniform Commercial Code § 5.02 [3] (1976).

[7] There is a paucity of authority on the right of a creditor to foreclose without notice to, and demand on, the debtor where the creditor, feeling insecure, has accelerated the maturity of the debtor's obligation and the debtor is not thereby or otherwise in default. In many situations, no doubt, the agreement explicitly authorizes the creditor to proceed against the collateral without notice or demand. In fact, in this case, the record contains a form of note, used by the bank in a previous loan to Killeen, which permits such action. In other cases, the agreement may explicitly require a demand after acceleration when the creditor has deemed itself insecure. See *Klingbiel* v. *Commercial Credit Corp.*, 439 F.2d 1303, 1307 (10th Cir. 1971). Of course, as a practical matter, most creditors who accelerate the due date of a debt because they deem themselves insecure, and who do not have a contractual right to proceed forthwith against the collateral, notify the debtor and demand payment, thus laying the basis for a default which would justify foreclosure.

unfair or deceptive act or practice as defined in G. L. c. 93A, § 2(*a*). There was no violation of G. L. c. 140C, the Truth-in-Lending Act, entitling the Killeens to rescission of the mortgage or to any other relief.

The judge properly ruled that, on the facts found by him, the bank did not commit a deceptive act under G. L. c. 93A, § 2(*a*), in selling the stock. The judge did not find, as Killeen argued, that the bank obtained the mortgage by representing that the stock would not be sold. On the contrary, he found that an agent of the bank told Killeen that the bank could give no such assurance. The judge thus was not plainly wrong in finding that the bank's sale of the stock was not deceptive. Kileen misconstrues our role in arguing that we should reach factual conclusions in disregard of the judge's factual findings against him.

The bank's sale of the stock, in the erroneous belief that it had the right to sell it, does not constitute an unfair act within the meaning of G. L. c. 93A, § 2(*a*). Just as every lawful act is not thereby automatically free from scrutiny as to its unfairness under c. 93A (see *Schubach* v. *Household Fin. Corp.*, 375 Mass. 133, 137-138 [1978]), so not every unlawful act is automatically an unfair (or deceptive) one under G. L. c. 93A. "The circumstances of each case must be analyzed, and unfairness is to be measured not simply by determining whether particular conduct is lawful [or unlawful, we now add] apart from G. L. c. 93A but also by analyzing the effect of the conduct on the public [or the consumer]." *Schubach, supra.* In interpreting the meaning of the words "unfair or deceptive acts or practices" in G. L. c. 93A, § 2(*a*), we are instructed to be guided by interpretations of similar language in the Federal Trade Commission Act. *Id.*, § 2(*b*). No interpretation of that language by the Federal Trade Commission or by any court has been brought to our attention in connection with acts similar to those involved in this case. The absence of such an interpretation involving a bank is understandable because the Federal Trade Commission Act does not apply to banks. 15 U.S.C. § 45(a)(2)

(1976). See *United States* v. *Philadelphia Nat'l Bank*, 374 U.S. 321, 336 (1963). See also note 8 *infra*.

Analyzing the situation as a whole, we see no unfair act or practice in the bank's sale of the stock. Killeen knew that the bank was concerned about its security. That concern was reasonable. The bank had no knowledge of any substantial assets available to Killeen other than those which the bank held as security. As he testified, however, Killeen had approximately $53,000 in cash immediately available to him on the day the bank started selling the stock, and he had had those funds available for a considerable period of time. Killeen also had available securities, other than those pledged, worth at least $10,000, and a coin collection worth about $15,000. Balancing the equities in the relationship of the parties, a major factor in determining unfairness under G. L. c. 93A, § 2, we conclude that the bank's conduct was not unfair. We discern neither an over-zealous seller taking economic advantage nor a defenseless consumer. We need not reach the question whether for other reasons relief would not be available under § 9 of G. L. c. 93A.[8]

---

[8] There are a number of considerations which might bear further on the availability of relief under G. L. c. 93A, § 9(1). (a) At the time of the loans, Killeen was in the business of buying and selling stock for his own gain. He had apparently used borrowed funds, in part, to purchase the stock pledged to the bank. If the proceeds of the original loans were used in Killeen's business to purchase stock, the loan transactions might not qualify as loans "primarily for personal, family or household purposes" under G. L. c. 93A, § 9(1). See *Slaney* v. *Westwood Auto, Inc.*, 366 Mass. 688, 701 (1975). Cf. G. L. c. 106, § 9-109(1) (defining "consumer goods" under the Uniform Commercial Code). (b) Is one who borrows funds one who "purchases or leases goods, services or property" under G. L. c. 93A, § 9(1)? Also, there is a question whether G. L. c. 93A applies to banks. See G. L. c. 93A, § 2(b); 15 U.S.C. § 45(a)(2) (1976); 12 Op. Att'y Gen. 150 (1976). (c) The collection practices involved here also may not fall within G. L. c. 93A, § 9(1), depending on whether a private action under § 9 (1) may be maintained for alleged unfair or deceptive acts or practices not occurring as part of the purchase or lease of goods, services, or property. As we noted in *Dodd* v. *Commercial Union Ins. Co.*, 373 Mass. 72, 81 (1977), "[s]ection 9 provides a remedy for persons who purchase property or services and

The judge was correct in ruling that the mortgage was valid. The terms of the notes authorized the bank to demand additional security if it deemed the initial security to be insufficient by reason of a decline in its market value. The judge was not wrong in ruling, or plainly wrong in finding, that the bank did not obtain the mortgage by any fraudulent, deceptive, or unfair act or practice. The mortgage was not obtained on any representation that the pledged securities would not be sold. There was no unfair or deceptive act or practice within the meaning of G. L. c. 93A, § 2 (*a*), in the procedure by which the mortgage was obtained.[9]

We reject the Killeens' argument that they are entitled to relief because the bank violated certain provisions of G. L. c. 140C. We assume, without deciding, that Mrs. Killeen was a "customer" entitled to relief under G. L. c. 140C. See G. L. c. 140C, § 1(*n*). One of the two statutory forms of notice required by G. L. c. 140C, § 8(*b*), as to a mortgage on a borrower's principal residence, did not have the bank's name on it. Although handwriting recorded through carbon paper onto all copies of the form, a stamp with the bank's name on it did not. The Killeens claim that the mortgage therefore must be forfeited. This omission was insignificant and unintended. The Killeens knew who the lender was, and they did not undertake

*thereby* suffer a loss" (emphasis supplied). See *Kantrovitz* v. *Academy of Physical & Social Dev. Corp.*, 370 Mass. 858 (1976). This aspect of the availability of § 9 relief was not considered in two cases involving the collection practices of finance companies. See *Baldassari* v. *Public Fin. Trust*, 369 Mass. 33 (1975); *Schubach* v. *Household Fin. Corp.*, 375 Mass. 133, esp. 135 n.3 (1978), where the issue was implicitly left open.

[9] The considerations expressed in note 8 above are also relevant to whether the Killeens are entitled to relief under G. L. c. 93A, § 9(1), with respect to the mortgage. Mrs. Killeen seemingly would have no claim under § 9 in any event because she was not one who purchased or leased goods, services, or property from the bank. See *Dodd* v. *Commercial Union Ins. Co.*, 373 Mass. 72, 81 (1977). Indeed, the Killeens' granting of the mortgage with respect to an antecedent debt does not readily fit within the language of G. L. c. 93A, § 9(1).

seasonably to rescind the transactions, as the bank's notice advised them they could. Section 10(b) of G. L. c. 140C provides penalties for failure to disclose any information required under G. L. c. 140C. Here the name of the lender was disclosed, and thus relief under G. L. c. 140C, § 10(b), is not available. Because the Killeens received delivery of the disclosures required by § 8 and did not cancel the transaction within the three days following the granting of the mortgage, they were not entitled thereafter to rescind the mortgage under G. L. c. 140C, § 8. There has been compliance with the requirements of law, and the Killeens sustained no loss or disadvantage. If no statutory notice at all had been given, the result would be different. See *Shepard* v. *Finance Assocs. of Auburn, Inc.*, 366 Mass. 182, 186-187, 194 (1974). Consumer acts, such as G. L. c. 140C, have been passed to provide "a more equitable balance in the relationship of consumers to persons conducting business activities" (*Commonwealth* v. *DeCotis*, 366 Mass. 234, 238 [1974]), but such consumer legislation should not be construed as creating new inequities or placing burdens on business beyond those necessary to make required disclosures and to provide a balance of equities between the parties.

The only other violation of G. L. c. 140C asserted by the Killeens is based on the fact that the mortgage referred to the interest rates of the loans in terms of "the small business prime rate in effect from time to time" at the bank, increased by .75%.[10] Because the three outstanding notes had different rates of interest, each based on the small business prime rate at the time of its execution, the language in the mortgage was a reasonable explanation of Killeen's interest obligations. There is no reasonable basis for contending that the bank was trying to change the interest rates of the outstanding notes.

---

[10] The Killeens' brief refers rather nonspecifically to violations of the disclosure requirements of G. L. c. 140C, §§ 5, 7, and 10.

The judge was correct in denying relief under G. L. c. 93A and G. L. c. 140C and in entering a judgment declaring the mortgage to be valid. Quite apart from G. L. c. 93A and G. L. c. 140C, however, Killeen is entitled to damages for the wrongful sale of the stock, a question to which we now turn.

### Damages

Killeen is entitled to recover the fair market value of the stock at the time of its sale by the bank. *Hall* v. *Paine,* 224 Mass. 62, 64-71 (1916), cert. denied, 248 U.S. 581 (1918). See *George* v. *Coolidge Bank & Trust Co.,* 360 Mass. 635, 641 (1971); *Somerville Nat'l Bank* v. *Hornblower,* 293 Mass. 363, 370 (1936). The breach of contract occurred on June 25, 1974, when the bank wrongfully foreclosed on the shares with the intent to sell them and placed an order for their sale.

The only question is which of the prices at which the stock sold during June 25, 1974, should be used in computing Killeen's damages. In certain circumstances, such as in the valuation for tax purposes of stock traded on a stock exchange, the mean between the high and the low of the day's selling prices is the appropriate measure. See, e.g., Massachusetts Inheritance and Estate Taxes Procedural Manual, § 4 (a), printed in 1 G. Newhall, Settlement of Estates 122 (4th ed. 1958, Cum. Supp. 1978); Treas. Reg. § 20.2031-2(b)(1), T.D. 7327, 1974-2 C.B. 294, T.D. 7432, 1976-2 C.B. 264. The stock sold for as high as 10 and as low as 9⅝ on June 25, 1974. The judge selected the sale price first obtained by the bank when it sold 100 shares at $9⅝ a share.[11] We are not impressed with the use of the fortuitous price (9⅝) at which the bank's first sale was made. We do not know the highest price for

---

[11] All subsequent sales during the period from June 25 to June 28 were at lower prices, although that circumstance is irrelevant where the crucial value is the value at the time of the foreclosure on the stock. See *Somerville Nat'l Bank* v. *Hornblower,* 293 Mass. 363, 370 (1936).

which the stock sold on June 25, 1974, after the bank foreclosed on the stock. We think that, at least in the absence of any more specific evidence of sale prices during the crucial day, the fair market value of the stock is best reflected by the highest price (10) which a buyer was willing to pay for a share of the company's stock on the stock exchange on June 25, 1974. In *Bradley* v. *Hooker*, 175 Mass. 142, 143 (1900), we observed that "[i]n the stock exchange buyers and sellers are brought together in a focus, with the result that there is no danger of missing the highest price by the accident of missing the man who would give it."

We, therefore, accept Killeen's contention that, at the least, he is entitled to the value of his stock measured by the highest price for which shares of that stock sold during June 25, 1974.[12] We reject, however, Killeen's further contention that he is entitled to the return of an equivalent number of shares of stock in the company or that his damages should be measured by the higher value of the stock at some subsequent date. We have long rejected such claims where securities had an ascertainable market value and that market value was not affected by peculiar circumstances. *Hall* v. *Paine, supra* at 64-69, and cases cited. On the other hand, we reject the bank's argument that Killeen is entitled only to nominal damages. The bank contends that Killeen could have mitigated his damages by purchasing replacement shares at prices the same as, or lower than, those at which the bank sold the stock. Such a rule has been applied where a stockbroker sold a customer's securities without right and the securities thereafter declined in value. See *Dennett* v. *Wilmerding*, 291 Mass. 264, 270 (1935). See also *Krinsky* v. *Whitney*, 315 Mass. 661, 669-670 (1944). Under this rule, a defendant broker is not held liable for the consequences of his improper sale of stock beyond the time when the

---

[12] It is in this respect only that we disagree with the judge's rulings on any aspect of the case.

customer reasonably could have rectified the error. We decline to apply an analogous rule in measuring the damages of a person whose collateral, pledged to secure a personal loan, is sold in breach of contract. Adoption of the rule for which the bank contends would allow a lender to sell pledged collateral at any time without any contractual right to do so and yet not be liable, other than nominally, for the breach. Under such a rule, the borrower would merely be credited with the net proceeds of the sale. If we were to treat the wrongful sale of the stock as being in the nature of a conversion, recovery would be limited to the fair market value of the stock at the time of the conversion. *Somerville Nat'l Bank* v. *Hornblower*, 293 Mass. 363, 370 (1936). Because Killeen did not have the right to immediate possession of the stock, there was no conversion. *Krinsky* v. *Whitney, supra* at 669. However, we fail to see why the damages in a case such as this should depend on whether the wrong is characterized as a tort or as a breach of contract. Killeen should be credited with the value of what the bank took at the time it foreclosed on the stock, just as if he had made a payment in like amount at that time.[13]

The wrong was committed when the bank foreclosed on all the stock at one time, by determining to sell all the stock and placing an order for its sale. On remand, a judgment shall be entered to reflect Killeen's damages based on a valuation of the stock at $10 a share.

### Interest Obligations

The bank challenges the judge's determination to reduce Killeen's obligations to the bank as of June 25, 1974, by the fair market value of the stock on that date. It argues that Killeen's entire obligation to it should have continued to bear interest at the rates stated in the notes

[13] If the stock had appreciated in value between June 25 and the dates on which it was sold, perhaps the bank would not have been entitled to profit from the appreciation.

until the date of judgment, and that Killeen's claim for the wrongful sale of his stock should bear interest to the date of judgment at the lower statutory rate of 8% (see G. L. c. 231, § 6C).

The judge was correct in reducing Killeen's obligations to the bank as of June 25, 1974, by the fair market value of the stock. If Killeen had made payment to the bank on that date in a like amount, his obligations to the bank would have been reduced immediately to that extent. The bank is hardly in a position to claim that the result should be otherwise, when it foreclosed on the stock to pay itself in advance of the due dates of the notes and in violation of its contractual obligations to Killeen.[14]

## Conclusion

The judgment is vacated, and the case is remanded to the Superior Court for the entry of a judgment consistent with this opinion.

*So ordered.*

---

[14] In view of this conclusion, we need not decide whether the rates of interest set forth in the notes (reflecting Killeen's interest obligations to the bank) should be treated as "contract rates" (see G. L. c. 231, § 6C) to be used in lieu of the statutory interest rate not only as to Killeen but also as to the bank. The parties apparently agree that the rates in the notes are "contract rates" as to Killeen. If they were "contract rates" as to the bank as well, they would reflect the rate or rates of interest on the bank's obligations to Killeen. If the obligations of both the bank and Killeen bore the same rates of interest, it would not matter as of what date the net obligation of the parties was determined.